**In re HOMESTORE.COM, INC. SECURITIES LITIGATION**

**No. 01–CV–11115 MJP(CWX).**

United States District Court, C.D. California, Western Division.

May 11, 2004.

Bruce L. Simon, Joseph W. Cotchett, Peter E. Borkon, Mark Cotton Molumphy, Steven N. Williams, Cotchett Pitre Simon & McCarthy, Burlingame, CA, Clifford H. Pearson, Gary S. Soter, Wasserman Comden Casselman & Pearson, Tarzana, CA, Jeffrey H. Dasteel, Katherine M. Pratt, Skadden Arps Slate Meagher & Flom, Los Angeles, CA, Tracey L. Worthington, Bernstein Litowitz Berger & Grossmann, San Diego, CA, for Plaintiffs.

Robert C. Vanderet, Seth A. Aronson, Sharon Louise Tomkins, O'Melveny & Myers, Howard M. Privette, Morgan J. Miller, Paul Hastings Janofsky & Walker, Marc A. Fenster, Russ August & Kabat, Wendy L. Wallace, Daniel S. Floyd, Dean J. Kitchens, Lynn M. Dean, Mark Mermelstein, Richard J. Doren, Sogol K. Pirnazar, Ted Allan Gehring, Gibson Dunn & Crutcher, Jan L. Handzlik, Howrey Simon Arnold and White, Thad Alan Davis, John B. Quinn, Quinn Emanuel Urquhart Oliver & Hedges, Stuart A. Shanus, Reed Smith Crosby & Heafey, Richard R. Mainland, Fulbright & Jaworski, Bernard C. Barmann, Jr., Ralph F. Hirschmann Law Offices, Torgny R. Nilsson, Thelen Reid & Priest, Yolanda Orozco, Liner Yankelevitz Sunshine and Regenstreff, J. Christian Word, Everett C. Johnson, Jr., Belinda S. Lee, Latham & Watkins, Laurie A. Traktman, Gilbert & Sackman, Los Angeles, CA, Steven F. Helfand, John William Davis, John W. Davis Law Offices, Nanci L. Clarence, Kathleen T. Dyer, Clarence Snell & Dyer, San Francisco, CA, Ryan T. Scarborough, George Borden, Ana C. Reyes, Williams & Connolly, Kristen Flynn, Graeme W. Bush, Carl S. Kravitz, Roger C. Spaeder, Zuckerman Spaeder, Washington, DC, Stephen P. Warren, Samuel Kader, Skadden Arps Slate Meagher & Flom, Richard J. Babnick, Jr., Marc J. Ross, Sichenzia Ross Friedman Ference, New York, NY, Walter Jesse Robinson, III, Krista J. Martinelli, Pillsbury Winthrop, Kent Wycliffe Easter, Douglas J. Clark, Wilson Sonsini Goodrich & Rosati, Mary T. Huser, Bingham McCutchen, Palo Alto, CA, Phillip H. Ginsberg, Pallavi Wahi, Stokes Lawrence, Whitney H. Leibow, Maureen D. Burke, J. Thomas Richardson, Cairncross & Hempelmann, Seattle, WA, Peter B. Tafeen, Kirkland, FL, Pamela J. Naughton, Sheppard Mullin Richter & Hampton, San Diego, CA, Thomas O. Helton, Alison T. Shaw, Baker Donelson Bearman & Caldwell, Chattanooga, TN, William D. Naeve, Cotkin Collins & Ginsburg, Santa Ana, CA, Charles L. Zetterberg, Buxbaum & Chakmak, Claremont, CA, Tatia M. Lira, Richard C. Vasquez, Eric William Benisek, Morgan Miller & Blair, Walnut Creek, CA, William A. Isaacson, Tanya Chutkan, David W. Shapiro, Boies Schiller & Flexner, Oakland, CA, Paul D. Murphy, Jodi M. Newberry, Murphy Rosen and Cohen, Santa Monica, CA, Jeffrey Speiser, Herbert J. Stern, Edward S. Nathan, Stern & Greenberg, Roseland, NJ, Nicholas Koluncich III, Nicholas Koluncich III Law Offices, Albuquerque, NM, for Defendants.

## ORDER DENYING DEFENDANT WOLFF'S MOTION FOR SUMMARY JUDGMENT

PECHMAN, District Judge.

### INTRODUCTION

This matter comes before the Court on Defendant Stuart H. Wolff's Motion for Summary Judgment (Dkt. No. 361). By his motion, Defendant Wolff argues that Plaintiffs cannot, as a matter of law, demonstrate that he acted with scienter under Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5,17 C.F.R. § 240.10b–5(b), promulgated thereunder. Defendant Wolff also argues that Plaintiffs cannot, as a matter of law, demonstrate that he is a "control person" under Section 20(a) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78t(a). Having considered the Motion, the responses, and exhibits,[1] filed

---

**1.** Unless otherwise specified, citations refer to Plaintiffs' Exhibits. For example, the Deposition Transcript submitted by Plaintiffs and taken of Joseph Shew is referred to as "Ex. O, Shew Dep." Exhibits proffered by Defendant Wolff are noted as "Def.'s Ex. __." Of note,

by the parties, and having heard oral argument on the issues, Defendant Wolff's Motion is hereby DENIED in its entirety. Under Section 10(b) and Rule 10b–5, Plaintiffs raise issues of material fact that Defendant Wolff acted with scienter throughout the class period. Under 20(a), Plaintiffs raise issues of material fact that Defendant Wolff had sufficient day-to-day responsibilities and control over Homestore and did not meet the burden of proving he acted in good faith.

## BACKGROUND

### A. General Information

Lead plaintiff CalSTRS, a pension fund for California teachers, brought this class action for damages arising from Plaintiff's purchase of large amounts of Homestore common stock. Plaintiff originally brought this suit against Homestore.com, Inc., several of its officers, and several outside business partners and third party vendors. Plaintiff alleged in its complaint that several Homestore insiders, with the knowledge of Homestore's auditor PricewaterhouseCoopers ("PwC") and the active participation of various outside business entities, unlawfully "created revenue" through various types of dubious transactions in order to prop up Homestore's stock price. Plaintiff claimed that these transactions, combined with improper accounting and the release of written and oral public statements made to the SEC, analysts, and the general public, perpetrated a fraud on Homestore's shareholders and the investing public in violation of federal securities statutes and regulations promulgated thereunder. Eventually, Homestore was forced to restate seven quarters of revenue because of the improper transactions and accounting. By this action, Plaintiff seeks to recover damages incurred when the market price of Homestore common stock fell once the need for restatement became public.

More specifically, Plaintiff alleged in its complaint that Homestore's management, including Defendants Peter Tafeen, former Executive Vice President of Business Development and Sales, and Stuart Wolff, former CEO and Chairman, were driven to achieve certain "revenue targets" that were set by analysts and, more generally, Wall Street. Examining a company's revenues had become a means of measuring the value of, or predicting the potential future success of, many start-up companies that were not yet profitable. Plaintiff alleged that Homestore's management became preoccupied, if not obsessed, with meeting or exceeding revenue goals. If those goals could not be legitimately achieved, Plaintiff alleged, management engaged in three different but related types of transactions with third party entities, all of which "created revenue" for Homestore through various ways that the transactions were constructed and "booked." These are "barter transactions," "buying revenues" or "revenue purchasing," and "triangular transactions." As time progressed, Plaintiff allege that the revenue transactions became more and more complex in order to keep PwC from questioning the accounting of the transactions.

"Barter transactions" are two-party, reciprocal ("back-and-forth") transactions. At various times, but mostly early in the class period, Plaintiffs allege that Home-

however, is that within his documents filed in support of his Motion for Summary Judgment, Defendant Wolff confusingly uses the same letters twice. For example, the first Exhibit C is for a videotaped deposition of

Phillip Harkins; the second Exhibit C (in the same set of documents) refers to a videotaped deposition of David M. Colburn. Exhibits proffered by PricewaterhouseCoopers are noted as "PwC Ex. _."

store and other companies agreed to trade services, generally advertising on the Homestore.com web site in exchange for some amorphous service such as "web services" or "marketing solutions." This would be a true barter transaction. However, instead of just trading those services, the two companies agreed to buy each other's services for an extremely exaggerated rate. For example, Homestore might pay $5 million for marketing solutions, and the other company pays $5 million for advertising. Homestore then realizes the $5 million in revenues. In accounting for these transactions, Homestore was supposed to provide actual market value of the services, "net out" the cost of the reciprocal transaction (making the net revenue zero), and/or report the two transactions as linked. Plaintiffs allege that Homestore, with the assistance and guidance of PwC, often attempted to dissociate a pair of transactions temporally and legally by intentionally booking the transactions in two different quarters, thereby recognizing the revenue from the "sale" of its advertising.

"Buying revenues" are two-party transactions as well, and are very similar to the barter transactions. The difference is that in this instance Homestore traded stock "warrants" (a form of stock option) for some service, and received cash for some other service like advertising. The true transaction is the cash for the warrants, known as a "stock-for-revenue" transaction, which must be reported as such in accounting for the transactions.

"Triangular transactions," or "roundtripping" transactions, were slightly more complex transactions involving three parties that were completed later in the class period. By way of example, AOL and Homestore entered into a "revenue sharing agreement" or "advertising reseller agreement" in which AOL agreed to sell advertising for Homestore for a commission far above market value. This agreement may be valid on its own, but set the stage for allegedly improper transactions. Homestore would find some third party corporation, one that was thinly capitalized and in search of revenues in order to "go public." Homestore then agreed to purchase shares in that company for inflated values or to purchase services or products that Homestore did not need. This transaction was contingent on the third party company "agreeing" in a "hidden leg" to buy advertising from AOL for most or all of what Homestore was paying them. The money thus flowed through the third party to AOL, which then took a commission and shared "revenue" with Homestore. This is an exceptionally expensive way to create revenue due to the cuts taken in each step along the way. This practice depleted the cash reserves of Homestore, but created "revenue" in order to meet the revenue targets, resulting in an inflated stock price.

Several of the above-described transactions occurred during the class period, and they became more complex as time passed. The improper and/or fraudulent nature of those transactions finally became apparent in late 2001, when extremely suspect circumstances surrounding a transaction with a company called L90 came to light. Homestore's Audit Committee found the situation sufficiently alarming that a general investigation under Section 10A of the Securities Exchange Act was commenced. The Audit Committee retained counsel and a forensic accounting firm, who conducted the investigation into issues of potential fraud and financial statement misrepresentation. PwC then reviewed Homestore's financial statements and determined that revenues recognized on a number of transactions between Q2 2000 and Q3 2001 had to be restated in order to be consistent with the GAAP. The total amount restated for revenues during the class period was

approximately $160 million. The Securities Exchange Commission and the United States Attorney's Office have been conducting investigations into these matters since that time, and have produced several plea agreements, including the payment of substantial monetary penalties.

By prior order resolving thirteen motions to dismiss, the Court held as a matter of law that the outside defendants, with the exception of PricewaterhouseCoopers, could not be held liable under Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 and SEC Rule 10b–5 in accordance with the Supreme Court's decision in *Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), which eliminated "aiding and abetting" liability in private securities, fraud actions. Some of the inside defendants were also dismissed from the case without prejudice for Plaintiff's failure to sufficiently plead allegations of fraud against them under the analysis of the Private Securities Litigation Reform Act ("PSLRA") of 1995, 15 U.S.C. § 78u, as interpreted by the Ninth Circuit in *In re Silicon Graphics, Inc. Securities Litigation,* 183 F.3d 970, 977 (9th Cir.1999). In contrast, the Court held that Plaintiff had sufficiently pled facts stating a cause of action as to Homestore's auditor PricewaterhouseCoopers and its former CEO and Chairman Stuart Wolff. Former Executive Vice President of Business Development and Sales Peter Taffeen and the corporate entity Homestore.com, Inc. answered the complaint without filing a motion to dismiss, and the case then proceeded as to those remaining four Defendants.

A shareholder class was later certified as follows:

All persons or entities (excluding defendants, any members of their immediate families, any person, firm, trust, corporation, present or former officer, director, or other individual or entity in which any Defendant has a controlling interest or which is affiliated with any of the Defendants, and any legal representatives, agents affiliates, heirs, successors-in-interest or assigns of any excluded party), who purchased Homestore.com, Inc. stock from January 1, 2000 through December 21, 2001.

(Order Granting Renewed Motion for Class Certification, Dkt. No. 279). Discovery then proceeded, a task involving dozens of depositions and the production of tens of thousands of documents. Meanwhile, the Plaintiff class arrived at a settlement with the corporate entity Homestore.com, Inc.; the Court recently approved that settlement pursuant to Federal Rule of Civil Procedure 23(e). The case against Defendants Wolff, Taffeen, and PwC continues.

**B. Background Specific to Defendant Stuart Wolff**

Defendant Wolff was a key person at Homestore since its founding. As one of the co-founders of Homestore's predecessor company, Realtor.com, in 1996, Defendant Wolff helped Homestore go "public" in 1999. He also served as Homestore's CEO and Chairman from 1996 to 2002, including the entirety of the class period from January 1, 2000 through December 21, 2001. Plaintiffs allege that Defendant Wolff was a hands-on manager in a company determined to be the best, and that he was personally involved with setting Homestore's financial goals. Further, Plaintiffs assert that Mr. Wolff and others were aware that the financial markets would react "punitively" if Homestore's revenue projections were not met. Defendant Wolff allegedly participated in or knew about the deals structured to create revenue through the various transactions discussed above to prop up Homestore's

stock price. According to Plaintiffs, from the initial public offering in 1999 to September 2001, Homestore in general and Defendant Wolff in particular continued to release information stating that the company's revenue projections had been met or exceeded; analysts reacted with positive reviews and encouraged their customers to buy Homestore stock. After several consecutive quarters of positive news, Homestore first announced the likelihood of needing to restate its earnings for the previous quarter in its October 31, 2001 press release. Eventually, Homestore restated its earning statements for the previous seven quarters. After these restatements took place, the Securities and Exchange Commission ("SEC") investigated Homestore and four former executives pled guilty for various criminal charges involving securities fraud and insider trading. In early 2002, Stuart Wolff left Homestore.[2]

Plaintiffs brought this suit alleging that under Section 10(b) and Rule 10b–5 of the Securities Exchange Act they were injured after they relied on Defendant's materially false and misleading misstatements and bought Homestore stock. Further, they allege that because of Defendant Wolff's position of control and authority, he violated Section 20(a) by not preventing the release of materially false and misleading SEC filings, press releases, and analysts' reports, or causing them to be corrected. Specifically, Plaintiffs allege that Defendant Wolff was personally involved in creating and making numerous false or misleading statements involving fourteen different transactions over the restated seven quarter period. Defendant Wolff now brings this motion for summary judgment on all Plaintiffs' claims, asserting that Plaintiffs cannot establish, as a matter of law, that Mr. Wolff (1) made the statements at issue, or participated in the transactions underlying them, with the requisite scienter, or (2) that he possessed the required level of control. Before reaching these claims, the Court rules on Defendant Wolff's evidentiary objections.

## ANALYSIS

### A. Evidentiary Objections

As an initial matter, the Court addresses Defendant Wolff's Evidentiary Objections and Motion to Strike. By this Motion, Defendant Wolff objects to much of Plaintiffs' evidence and moves to strike specified portions of various exhibits. Many of the objections are to evidence used by Plaintiffs in a related claim against PwC, not against Defendant Wolff, accordingly, the Court declines to address these objections. Because the Court may only consider admissible evidence in ruling on a motion for summary judgment, Fed.R.Civ.P. 56(e); *Orr v. Bank of America*, 285 F.3d 764 (9th Cir.2002) (citations omitted), this Order addresses the admissibility of the evidence relied on by the Court and other sections the Court specifically declined to rely on for evidentiary reasons. Evidence otherwise not relied on by the Court is not addressed. In making the evidentiary determinations for summary judgment, the Court does not preclude the parties from re-addressing the evidentiary issues at trial. Much of Plaintiffs' evidence upon which the Court cannot rely presently would be admissible if properly authenti-

---

**2.** As of May 3, 2004, Defendant Wolff had not yet been deposed for this civil suit. The Court has ordered that this deposition proceed, but that information is not available to the Court in considering this motion. Although the numerous continuances of Mr. Wolff's deposition could have been grounds for a Fed. Rule of Civ. Pro. Rule 56(f) motion, Plaintiffs did not bring such a motion.

cated and introduced; Plaintiffs will have an opportunity to do so at trial or via motions in limine.

### 1. Deposition Testimony

#### a. *Testimony of Board of Directors (Exs.H, J)*

■ In Exhibit H, Defendant Wolff objects to Mr. Kelvie's testimony for lack of foundation, improper opinion and conclusion, speculation, hearsay, and irrelevant. These objections are overruled. As a member of Homestore's Board of Directors and its Audit Committee, Mr. Kelvie possessed personal knowledge and perceptions of Defendant Wolff. His opinion testimony is admissible under Fed. Rule of Evid. 701, is not hearsay, and is relevant to Mr. Wolff's role at Homestore.

In Exhibit J, Defendant Wolff objects to portions of Kenneth Klein's testimony as "non-responsive to the question, improper opinion and conclusion, speculation, lacks foundation, hearsay, irrelevant." The question posed to Mr. Klein was "through your experience working with Mr. Wolff, did you come to an understanding that he did not have any training or experience in accounting matters?" Mr. Klein testified that "Stuart always exhibited a great grasp of knowledge that was needed to make his deals work. And so I have to assume from that that [sic] that included the-enough, enough foundation in finance, maybe not accounting, but in finance to know what he was doing." (Ex. J, Klein Dep. 207:21–208:1). The Court finds this answer to be sufficiently responsive, not hearsay, and based on Mr. Klein's personal knowledge and perception of Mr. Wolff.

#### b. *Joseph Shew (Ex. O)*

■ Defendant Wolff objects to multiple portions of Joseph Shew's testimony for many different reasons. (Def's Mot. to Strike, 39–102). Defendant then relies on other portions of Mr. Shew's testimony in his Motion for Summary Judgment. The Court overrules these objections and finds that as the former Chief Financial Officer at Homestore, Mr. Shew had the personal knowledge to testify about how Homestore operated, his impressions of Defendant Wolff's role in Homestore, and other related matters. Mr. Shew's testimony is relevant to Plaintiffs' claims and relevant to issues tendered in Defendant Wolff's Motion for Summary Judgment.

#### c. *PwC Auditors (Ex. S)*

■ Defendant Wolff objects to portions of Mr. Withey's testimony in Exhibit S as vague, ambiguous, and lacking foundation. As the PwC partner in charge of auditing Homestore, Mr. Withey testified on his knowledge and observations at Homestore. The Court found his testimony sufficiently clear and admissible under Fed.R.Evid. 701.

### 2. Wolff's Stock Sales Attached to the Expert Report of Jane Nettesheim

■ Defendant Wolff objects to Exhibit W, the Expert Report prepared by Jane Nettesheim that purports to be a compilation of Defendant Wolff's stock sales on the basis that it is "hearsay; lacks foundation, lacks proper authentication, improper opinion and conclusion; irrelevant." Plaintiffs assert that this document is an expert report compiled by Ms. Nettesheim and cite her background and the source of this data. Such an assertion does not adequately authenticate this report; accordingly, the Court finds this document is not properly authenticated and is inadmissible for purposes of summary judgment. *See* Fed.R.Evid. 901(a).

### 3. Documents Produced in Litigation

#### a. *PwC Work Papers (Exs. CC & EE)*

■ Defendant objects to Exhibit CC, a PwC work paper, as hearsay, irrelevant,

speculation, and for lack of foundation. PwC produced this document during discovery for this litigation; the document is a PwC work paper prepared during the course of business and is admissible as a business record.

 Defendant also objects to Exhibit EE, a document attached as an exhibit to PwC Auditor Jennifer Campos' deposition. The grounds for objection include hearsay, lack of foundation, speculation, improper opinions, conclusion, and summary, lack of authentication, and relevance. First, the Court finds this document to be authenticated. PwC produced Exhibit EE during the discovery process; such documents are deemed authentic when offered by a party-opponent. *Orr v. Bank of America*, 285 F.3d 764, 777 n. 20 (9th Cir.2002) (citing *Maljack Prods., Inc. v. GoodTimes Home Video Corp.*, 81 F.3d 881, 889 n. 12 (9th Cir.1996)). Second, the document was created during the normal course of PwC's business of auditing Homestore, so is an exception to the hearsay rule. Fed. R.Evid. 803(6). Third, Ms. Campos' position provided her the personal knowledge necessary to review and sign off on this document when it was written. This PwC work paper was prepared by Wade Kruse and signed by Jennifer Campos, both PwC auditors. Although Ms. Campos testified in her deposition that she did not personally write the document and could not "recall" the basis for any statements contained in the report, (Ex. B, Campos Dep. 96:5–100:25), she testified that she must have agreed with it when she reviewed it. (*Id.*, 99:18–19). Finally, this document is relevant to how Mr. Wolff operated as Homestore's CEO.

b. *Emails between Wolff and AOL (Exs.NN, OO, PP, OO, RR, SS, TT, UU, VV)*

 These exhibits contain emails sent from Defendant Wolff to his own staff

and to others outside Homestore. Defendant objects to these exhibits as hearsay, lacking foundation, vague and uncertain, irrelevant, and not properly authenticated. The Court addresses the issue of authentication first. Although none of these documents have affidavits from the actual authors laying the foundation that the emails are what they purport to be, *Orr*, 285 F.3d at 777, these documents are deemed authentic because Plaintiff identified the documents as being produced by parties in discovery. *Id.*, n. 20. According to Plaintiffs, Exhibits NN, OO, PP, QQ, and RR were retrieved from Homestore's email database and produced by PwC for this litigation. Exhibit SS was produced by Homestore via Wolff's computer hard drive and printed by Plaintiffs. Exhibits TT, UU, and VV were produced by AOL, once a party to this litigation but now dismissed. Second, emails written by a party are admissions of a party opponent and admissible as non-hearsay under Fed. R.Evid. 801(d)(2). These emails were written by Wolff; Plaintiffs offer his own statements against him. Third, the Court finds that these emails clearly relate to a transaction between AOL and Homestore during a time period in question in this case. Finally, these emails are highly relevant to Defendant Wolff's involvement in Homestore's financial dealings and are hereby admitted.

c. *Email Between Homestore Personnel (Ex. WW)*

 Exhibit WW is an email from Sophia Losh to Clayton Chan, Peter Tafeen, and Kim Gibson which discusses the need to talk with "Stuart." The Court finds this document is overly vague and is inadmissible for purposes of summary judgment. Defendant demonstrates that the Strategic Alliances Group, of which the above people

are members, also included someone named "Stuart Kim." Although one could infer from the email that "Stuart" refers to "Stuart Wolff," neither the text of the email itself nor witness testimony clarifies this issue.

#### d. Shew's Notes (Ex. DDD)

■ Exhibit DDD is apparently a set of notes prepared by Joseph Shew in preparation for the Homestore litigation. Defendant Wolff objects to the exhibit on grounds of hearsay; lack of foundation; improper summary, narrative, opinion, conclusion and compilation; speculation, and relevance. Plaintiffs note that Mr. Shew personally prepared the notes over time as a source of recollection for his counsel at his criminal proceedings, (Plfs.' Opp. at 14:14–18); however, the document also contains questions to counsel. Rather than parsing out each objection for each excerpt, the Court finds this exhibit is inadmissible hearsay for purposes of summary judgment.

#### e. Risk and Opportunities Schedule (Ex. GGG)

■ Defendant Wolff objects to Exhibit GGG, a Risk and Opportunities Schedule with a November 2000 pro forma forecast as hearsay, lacking foundation as to the handwriting, and irrelevant. Mr. Shew testified that such R & O schedules were regularly supplied to Mr. Wolff. (Ex. O, Shew Dep. 71:2–72:11). In particular, Shew testified that Defendant Wolff personally wrote notes on the R & O that is Exhibit GGG. (Id. 209:23–211:19). Finally, this document is not hearsay as it is not offered to prove the truth of the information contained in the report, but rather that Defendant Wolff received this kind of report from people like Mr. Shew. This report is relevant to Defendant Wolff's knowledge and is admissible.

#### f. Cahill Report (Ex. MMM)

■ Exhibit MMM is a memorandum written by David Montone summarizing an interview of Peter Tafeen held on February 7, 2002 at Homestore's offices. The interview was conducted by Cahill Gordon & Reindel, a law firm hired by Homestore's Audit Committee to do a forensic audit of Homestore's affairs. Mr. Wolff objects to this document on many grounds, including hearsay, lack of foundation, improper summary, improper opinions and conclusions, improper compilation, and lack of authentication. The Court finds this document is not properly authenticated and is inadmissible for purposes of summary judgment. The record does not contain a declaration or other testimony authenticating this document. Although Mr. Zurofsky, one of the attorneys listed as an interviewer, submitted to a deposition and discussed the "Cahill Report," this is insufficient to authenticate this one document that appears to be part of a larger set of documents.

#### 4. Press Releases and Earnings Releases (Exs.XXX, YYY, ZZZ, AAAA, BBBB, CCCC)

■ Defendant Wolff objects to Exhibits XXX–ZZZ and AAAA–CCCC as hearsay, lack of foundation and authentication. These documents are press and earnings releases printed from Homestore.com's website. Although the documents bear the URL address and date stamp, they are improperly authenticated by Plaintiffs' declaration. Printouts from a web site do not bear the indicia of reliability demanded for other self-authenticating documents under Fed.R.Evid. 902. To be authenticated, some statement or affidavit from someone with knowledge is required; for example, Homestore's web master or someone else with personal knowledge

would be sufficient. The Court finds that these exhibits are not properly authenticated and are inadmissible for purposes of summary judgment.

### 5. SEC Filings (Exs. FFFF and JJJJ)

 Defendant Wolff objected to Exhibits FFFF, a Form 10–K dated December 13, 1999, and Exhibit JJJJ, an S–8 Form dated April 9, 2001 as hearsay, lacking foundation, and not authenticated. The Court did not rely on these exhibits, but relied on PwC's exhibits 172–78 as the statements Homestore filed with the SEC. Documents offered by a party-opponent are deemed authentic under *Orr*, 285 F.3d at 777 n.20.

### B. Motion for Summary Judgment

Rule 56(c) provides, in part, that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). Summary judgment is not warranted if a material issue of fact exists for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir.1995), *cert. denied*, 516 U.S. 1171, 116 S.Ct. 1261, 134 L.Ed.2d 209 (1996).

As this is a motion by the Defendant, the underlying facts will be viewed in the light most favorable to the Plaintiffs. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party moving for summary judgment has the burden to show initially the absence of a genuine issue concerning any material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). However, once the moving party has met its initial burden, the burden shifts to the nonmoving party to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To discharge this burden, the nonmoving party cannot rely on its pleadings, but instead must have evidence showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548.

### 1. Liability under Section 10(b) and Rule 10b–5

 Plaintiffs contend that Defendant Wolff is liable for primary violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 for participating in Homestore's efforts to defraud its investors. Defendant Wolff argues that Plaintiffs cannot demonstrate that he acted with scienter. However, viewing the evidence in the light most favorable to Plaintiffs, the Court finds that Plaintiffs have produced evidence showing that there are genuine issues of material fact for trial.

#### a. General Standard for Scienter

 Section 10(b) states, in relevant part:

It shall be unlawful for any person, directly or indirectly . . . (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may proscribe as necessary and appropriate in the pub-

lic interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b–5(b) implements Section 10(b), and in pertinent part, makes it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b). Under this rule, the elements of a claim are: (1) a misrepresentation or omission of a material fact, (2) reliance, (3) scienter, and (4) resulting damages. *Paracor Fin., Inc. v. Gen'l Elec. Capital Corp.*, 96 F.3d 1151, 1157 (9th Cir.1996) (citation omitted). A plaintiff's claim fails if one of these elements is missing. *Id.*

■■■■ By his Motion, Defendant challenges only the scienter element. In securities fraud cases, scienter is a mental state "embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). A finding of scienter requires knowledge or recklessness. *Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1063 (9th Cir.2000).

> Reckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir.1990) (en banc). An actor is reckless if "he had reasonable grounds to believe that material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *Howard,*

228 F.3d at 1064 (citing *Burgess v. Premier Corp.* 727 F.2d 826, 832 (9th Cir.1984) (internal quotation marks and citations omitted)). In denying summary judgment in a situation where the CEO signed financial statements in the face of potentially alarming financial information, the Ninth Circuit has held that such recklessness can be demonstrated by showing potential motive and opportunity to commit securities fraud. *Howard,* 228 F.3d at 1064.

■■■■ "Because the PSLRA did not alter the substantive requirements for scienter under § 10(b), however, the standard on summary judgment or JMOL remains unaltered." *Howard,* 228 F.3d at 1064 (citation omitted). Accordingly, it is generally more difficult to overcome a motion to dismiss than a motion for summary judgment. *Reiger v. Price Water House Coopers LLP,* 117 F.Supp.2d 1003, 1011 (S.D.Cal.2000). "Although materiality and scienter are both fact-specific issues which should ordinarily be left to the trier of fact, summary judgment may be granted in appropriate cases. Summary judgment may be defeated in a securities fraud derivative suit only by showing a genuine issue of fact with regard to a particular statement by the company or its insiders." *Howard,* 228 F.3d at 1060 (citation omitted). However, "[s]ummary judgment on the scienter issue is appropriate only if there is no rational basis in the record for concluding that any of the challenged statements was made with the requisite scienter." *In re Software Toolworks Sec. Litig.,* 50 F.3d 615, 626 (9th Cir.1994) (citation omitted), *cert. denied,* 516 U.S. 907, 116 S.Ct. 274, 133 L.Ed.2d 195 (1995). Conflicting inferences result in a case for the jury. *Howard,* 228 F.3d at 1060.

Although the standard for summary judgment deals with particular statements or transactions, Defendant Wolff's motion for summary judgment dealt with his gen-

eral knowledge or recklessness and did not analyze his scienter according to individual statements or transactions. In their Opposition, Plaintiffs provide a non-exclusive discussion list of three example transactions for which they claim Defendant Wolff had the requisite scienter. Mr. Wolff then argues that even for these transactions, Plaintiffs failed to show that he was ever privy to all the facts. (Def.'s Reply at 9). Defendant Wolff again refutes his knowledge or deliberate recklessness. Because of the nature of both parties' arguments, this Court reviewed Mr. Wolff's Motion for Summary Judgment to see whether there was any rational basis to support Plaintiffs' claim that the incidents which occurred during the class period occurred with the requisite scienter.

### b. Defendant Wolff's Knowledge or Deliberate Recklessness

The evidence viewed in the light most favorable to Plaintiffs reveals that there are issues of material fact regarding Defendant Wolff's mental state and his participation in the events at Homestore. Throughout the class period, a trier of fact could infer that he had "reasonable grounds to believe that material facts were misstated or omitted, but failed to obtain or disclose such facts although he could have done so without extraordinary effort." *Howard*, 228 F.3d at 1064. Specifically, Plaintiffs present evidence that Wolff (1) either knew or should have known of the fraudulent deals used to create positive earnings statements through his general work setting revenue goals, (2) implemented actual deals, and (3) made public statements endorsing Homestore's accomplishments in generating revenue.

Plaintiffs present evidence that Defendant Wolff was "intimately involved with the finance process" (Ex. O, Shew Dep. 62:20–21) and helped "set goals in terms of where revenues should be, where earnings per share should be." (*Id.*, 63:4–6). He worked with others to set Homestore's financial goals based on other "category killers" or "Tier 1" companies like Amazon, Yahoo, eToys, eBay, and CNET that led their particular industry. (*Id.*, 64:14–69:23). Senior managers, including Defendant Wolff, had meetings "where we would talk about what it would take to remain a Tier 1 Internet company," (*Id.*, 66:7–10). In 2000, for example, management decided that Homestore needed "to double [its] revenues... to maintain a category killer." (*Id.*, 66:4–67:22). Former CFO Shew remarked that "[t]here was an absolute competitive atmosphere in that company top to bottom... It had to do with not just beating revenue expectations. We were precise. We were going to beat revenue expectations by X amount, X percentage. We were going to reset our guidance by X amount. We were going to beat that reset guidance by X percentage." (Ex. O, Shew Dep. 255:3–10). Defendant Wolff regularly received and reviewed risk and opportunity ("R & O") schedules and participated in discussions on how to fill the "plugs" or revenue gaps. (Ex. O, Shew Dep. 71:2–72:12, 209:23–213:15, 272:21–276:6; Ex. GGG, Shew Dep. Ex. 336). A PwC auditor noted that Homestore had an "unusually heavy pressure to achieve accounting-based performance objectives (e.g. excessive preoccupation with analyst expectations)." (Ex. S, Withey Dep. 272:23–273:12; Ex. 415 at PwC(HMS) 182214). Shew observed that it was understood at Homestore that Wall Street would react "punitively" if those targets were not met. (Ex. O, Shew Dep. 72:2–22). From this evidence, it can be inferred that Defendant Wolff knew of Homestore's financial situation and was driven by a desire to please Wall Street by meeting and beating revenue projections.

Plaintiffs' evidence also demonstrates that, despite his lack of formal training in finance and accounting, Defendant Wolff was involved in and knowledgeable about structuring actual deals. Former CFO Shew testified that Defendant Wolff was "involved in the details in terms of where the revenue sources were coming from" and personally took on finding components of the revenue. (*Id.* at 67:22–68:15). Homestore Audit Committee Member William Kelvie described Wolff as an aggressive deal maker who did not rely on his junior employees at meetings. (Ex. H, Kelvie Dep. 197:24–199:18). The Chairman of the Audit Committee, Kenneth Klein, testified that during the year 2000, Wolff presented more deals to the board for approval than any other member of the management. (Def's Ex. G, Klein Dep. 144:3–11). Klein also testified that Wolff "always exhibited a great grasp of the knowledge that was needed to make his deals work. And so I have to assume that . . . included enough foundation in finance, maybe not accounting, but in finance to know what he was doing." (Ex. J, Klein Dep. at 207–08). Finally, Mr. Wolff also personally had to sign off on all purchases greater than $50,000. (Ex. CC, Graham Dep Ex 51 at PwC(HMS) 105392). From this evidence, it can be inferred that Defendant Wolff participated heavily in Homestore's deal making efforts and knew or was reckless in not knowing information about their fraudulent or deceptive nature.

▇ In addition to such general involvement in deal making, Plaintiffs demonstrate that Defendant Wolff had knowledge of or was reckless in not knowing about specific deals. For example, Defendant Wolff was closely involved in the triangular transaction deal with AOL, a deal which in part led to the later restatement of Homestore's financial information. After working with AOL for much of 2000,

Shew testifies that in March 2001, "[t]he one conversation I did have relating to the acquisition with Peter Tafeen and Stuart Wolff was that to the extent that AOL acquired us, we would effectively be able to hide or wipe out the AOL deal we just did forever. It would never get discovered." (Ex. O, Shew Dep. 259:5–10). In April 2001, Shew met with Wolff and "told him how uncomfortable [Shew] was with doing the recently completed AOL transaction, and [Stuart Wolff] acknowledged that he agreed and didn't like it either." (*Id.*, 270:1–4). In May 2001, Wolff participated in a meeting at Cal Amigos to discuss the AOL triangular transactions; although he did not want any of the details, he knew that care was needed in documenting the transactions so that PwC did not find out. (*Id.*, 272:21–76:6, 278:23–79:3) ( Shew stated that "I assertively pointed out that we needed to be very careful on how we documented these transactions because there can't be anything for Pricewaterhouse to see on Cendant and AOL").

Certain emails highlight Defendant Wolff's involvement in deals like that with AOL. PwC audit partner Richard Withey testified that PwC "became aware of certain e-mails which were discussing settling out or a dispute with AOL over what was owed to whom under this triangle arrangement. And it was very clear, to me at least, from these e-mails that Mr. Wolff was both involved in that dialogue and knowledgeable of the true nature of this transaction." (Ex. S, Withey Dep. 492:7–13). Plaintiffs supply these emails from Stuart Wolff to people at AOL working to consummate a last minute deal in June and July, 2001. (Exs.NN–VV). For example, a June 28, 1001 email from Stuart Wolff to "Dkrjjl@aol.com" states "it looks like we are getting close to getting this done. . . .we need to get our cash now just as you have gotten yours. . . . Joe Shew

was told we would not be getting our cash immediately and this is both unfair and will not be received well here..." (Ex. QQ). A June 30, 2001 email from Stuart Wolff to "RIPPJ@aol.com" states that "I also request that you send me back or destroy all confidential material related to our acquisition discussions and send me a confirmation letter later this week when this is completed." (Ex. NN). From Mr. Shew's testimony and these emails, a trier of fact could infer that not only did Mr. Wolff know of the AOL deal, he actively worked on consummating the deal and then participated in trying to cover up Homestore's involvement.

 Plaintiffs also present issues of material fact that, like the CEO in *Howard*, Defendant Wolff signed financial statements in the face of potentially alarming information concerning Homestore's financial condition. Defendant Wolff signed every major statement sent to the SEC. (PwC Exs. 172–78). Although Defendant argues that he did not actually prepare the SEC statements, (Def's Mot. at 7–10, Reply Memo. at 2), "key corporate officers should not be allowed to make important false financial statements knowingly or recklessly, yet still shield themselves from liability to investors simply by failing to be involved in the preparation of those statements." *Howard*, 228 F.3d at 1062. Although the potential revenue shortfalls and quarter-end deals should have raised a "legitimate red flag," Defendant apparently took no affirmative steps "to ensure the accuracy of the disputed data" when he signed the SEC statements. *Id.*

 Finally, although Defendant contends that this is an issue about his scienter regarding accounting standards, this argument falls short under Section 10(a) and Rule 10b–5. Section 10(a) and Rule 10b–5 require Defendant Wolff to know or be reckless in not knowing that the information he was personally releasing was untrue or misleading in light of the circumstances under which the statements were made. Plaintiffs bear the burden of proving that any material fact supports this knowledge or deliberate recklessness. Under these securities laws, Plaintiffs do not need to prove that Defendant Wolff knew the accounting standards. Given Defendant Wolff's general involvement in Homestore's financial dealings, his work and knowledge of individual deals, and his statements to the public and SEC about Homestore's earnings, Plaintiffs present sufficient evidence to argue that Defendant Wolff violated Section 10(a) and Rule 10b–5. Under this evidence of knowledge or recklessness, Defendant's motion for summary judgment is denied.

### c. Motive and Opportunity to Engage in Securities Fraud

 Like the CEO in *Howard*, Defendant Wolff's knowledge or recklessness is bolstered by his potential motive (both professionally and personally) and his opportunity to engage in securities fraud. His potential motive for the company stemmed from the need to meet Homestore's optimistic projections detailed above. Defendant Wolff also had a personal motive to improve Homestore's earnings, as he owned and sold his own personal Homestore shares. (Def.'s Ex. I, Shew Dep. 676:21–687:14). This evidence supports an inference that Wolff had potential motives in his role as CEO and in his personal capacity to engage in securities fraud.

As the CEO, Chairman of the Board, and co-founder of Homestore, Defendant Wolff also had the opportunity to engage in securities fraud. Joe Hanauer remarked that as a CEO, "you spend more time on some things and less time on others, but overall you are still responsible

for them." (Def's Ex. B, Hanauer Dep. 98:22–25). Former CFO Joseph Shew observed that "Stuart was a very, very hands-on manager. He was intimately involved in the finances process...helping to set goals in terms of where revenues should be, where earnings per share should be..." (Ex. O, Shew Dep. 62:19–63:6). Another deposition by a PwC auditor states that "Stuart Wolff, CEO, manages using milestones such as financial performance, comparing actuals to budgets and forecasts. Every other week the Department heads meet with Stuart to assess progress towards these goals." (Ex. B, Campos Dep. 96:5–100:25; Ex. EE, Campos Dep. Ex. 66). Audit Committee and board member Kelvie stated that, "Stuart was inexhaustible in the deals that I—in the dealing that I had with him when I sat on the other side of the table, he was tireless and creative and very interested in putting very elaborate deals together." (Ex. H, Kelvie Dep. 174:18–25). Shew testified that at least in part, Defendant Wolff was a "kind of heavy-weight collection agent." (Ex. O, Shew Dep. 661:10–14). Taken together, a trier of fact could infer that Wolff had sufficient opportunity to commit securities fraud. Under *Howard,* evidence demonstrating potential motive and opportunity to commit securities fraud can be sufficient to withstand summary judgment. Accordingly, summary judgment on the issue of scienter is DENIED.

## C. Control Person Liability

▇ Defendant also moves for summary judgment on Plaintiffs' claim that Defendant Wolff was a "control person" under Section 20(a). Given the facts above and additional discussion below, this motion is also denied because the evidence supports at least an inference that Defendant Wolff exercised primary control over Homestore, the company in violation of the securities laws.

▇ Section 20(a) provides

Every person who, directly or indirectly, controls any person liable under any provision of this chapter of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting violation or cause of action.

Securities Exchange Act of 1934, 15 U.S.C. § 78t(a). To prove control person liability, a plaintiff must prove (1) a primary violation of federal securities law, and (2) that the defendant exercised actual power or control over the primary violator. *Howard,* 228 F.3d at 1065. Control is defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405. This inquiry revolves around the "management and policies of the corporation, not around discrete transactions." *Paracor Fin., Inc. v. General Elec. Capital Corp.,* 96 F.3d 1151, 1162 (9th Cir.1996) (internal quotations omitted)

▇ Whether a defendant is a controlling person "is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Howard,* 228 F.3d at 1065 (citing *Kaplan v. Rose,* 49 F.3d 1363, 1382 (9th Cir.1994)). A plaintiff "need not show a controlling person's scienter or that they culpably participated in the alleged wrongdoing." *Paracor Fin., Inc. v. General Elec. Capital Corp.,* 96 F.3d 1151, 1161 (9th Cir.1996)

(citation omitted). Once the plaintiff establishes that a defendant is a controlling person, the defendant then bears a burden of proving he acted in good faith. *Id.* Good faith can be demonstrated if a defendant can show no scienter and an effective lack of participation. *Howard,* 228 F.3d at 1065.

First, viewing the evidence in the light most favorable to the Plaintiffs, there is an issue of fact as to whether Defendant Wolff can be held liable as a control person because as CEO, Chairman of the Board, and a co-founder of the company, he controlled Homestore's management and policies. Although "a person's being an officer or director does not create any *presumption* of control, it is sort of a red light." *Arthur Children's Trust v. Keim,* 994 F.2d 1390, 1396 (9th Cir.1993) (quoting 4 Loss & Seligman, *Securities Regulation* 1724 (1990)) (emphasis in Loss & Seligman) (management committee members were control persons). In an earlier case, the Ninth Circuit held that although the status or position of an alleged controlling person by itself is not enough, "a narrowly defined group charged with the day-to-day operations of a public corporation" could reasonably be presumed to have the "power to control or influence the particular transactions giving rise to the securities violation." *Wool v. Tandem Computers, Inc.,* 818 F.2d 1433, 1441 (9th Cir.1987) (indirectly overturned on other grounds by *Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1575 (9th Cir.1990) (en banc), *cert.denied,* 499 U.S. 976, 111 S.Ct. 1621, 113 L.Ed.2d 719). Although one prong of the *Wool* control person test has been over-

turned,[3] the case still illustrates the direct involvement of individual defendants, including the CEO, COO, and VP/Controller, in the day-to-day affairs and in the financial statements. *Id.* at 1442. More recently, the Ninth Circuit held that the CEO's day-to-day management of the company and his review and signature of the financial statements indicated control. *Howard,* 228 F.3d at 1065–66.

In contrast to *Howard* and *Wool,* two other Ninth Circuit cases have held that a director or CEO was not a control person. In *Burgess v. Premier Corp.,* 727 F.2d 826 (9th Cir.1984), one director was not involved in the day-to-day operations, had no experience in the business or industry in question, and had nothing to do with the two prospectuses at issue; the other director had minimal interactions with the company and resigned before any investors lost money. The *Paracor* court held that the CEO was not a control person: although he was "at least consulted on every major decision," he did not manage the company on a day-to-day basis and was "the classic conceptualizer and idea man who leaves behind a long swath of details for someone else to handle," *Paracor,* 96 F.3d at 1163. Further, the *Paracor* CEO was not authorized to act on the company's behalf in the debenture offering and was not involved in preparation of any of the offering materials. *Id.* at 1163–64.

Plaintiffs allege material facts indicating that Defendant Wolff "had the power to control or influence" Homestore like the *Howard* CEO or the *Wool* directors. First, Defendant Wolff's position as the CEO raises a "red flag." As CEO, Mr.

3. In *Wool,* the Ninth Circuit had a different controlling liability test that required the plaintiff to allege that 1) the individual defendants had the power to control or influence the company, and 2) the individual defendants were culpable participants in the company's alleged illegal activity. *Wool v. Tan-* *dem Computers, Inc.,* 818 F.2d 1433, 1440 (9th Cir.1987). An en banc panel of the Ninth Circuit overruled the second prong of this test in *Hollinger,* 914 F.2d at 1575 (en banc); see also *Howard,* 228 F.3d at 1066 n. 10. Defendant frequently relies on *Wool,* but never notes this change of law.

Wolff had the power, either directly or indirectly, to direct or cause the direction of the management and policies. As demonstrated above, along with being the co-founder of the company and the Chairman of the Board of Directors, Defendant Wolff was a hands-on manager with personal involvement in setting yearly revenue goals, implementing and enforcing deals to meet those revenue goals each quarter, and making public statements. He personally presented deals to the Board of Directors and worked to make sure those deals were consummated; as mentioned above, one colleague referred to him as a "heavy-weight collection agent." (Ex. O, Shew Dep. 661:10–14). Although he might not have had a formal background in finance or accounting, testimony reveals his understanding of Homestore's finances. The evidence that Defendant Wolff was involved with the day-to-day operations and the financial aspects of Homestore supports an inference sufficient to withstand a motion for summary judgment.

■ Defendant Wolff is entitled to a good faith defense if he can "show no scienter and an effective lack of participation." *Howard,* 228 F.3d at 1065. Given the discussion of both scienter and participation above, Defendant's efforts to present a good faith defense adequate for summary judgment fall short.

### CONCLUSION

This Motion for Summary Judgment is denied. Reviewing the admissible evidence in a light most favorable to them, Plaintiffs raise issues of material fact that Defendant Wolff acted with scienter throughout the class period under Section 10(b) and Rule 10b–5 of the Securities and Exchange Act of 1934. In addition, Plaintiffs raise issues of material fact that Defendant Wolff had sufficient day-to-day responsibilities and control over Homestore to be a "control person" under Section 20(a); the Court finds that Defendant Wolff did not meet the burden of proving he acted in good faith under this section.